[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1220 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1221 
Leroy White was indicted and convicted for the capital burglary-murder of his wife, Ruby White, under Ala. Code 1975, § 13A-5-40(a)(4). He was sentenced to death by electrocution. His trial and sentencing procedures were in accord with the applicable sections of Alabama's 1981 Death Penalty Act, found in Ala. Code 1975, § 13A-5-39 et seq. The defendant raises 20 issues on this appeal from that conviction and sentence.
 I.
The defendant contends that blacks were under-represented on the jury venire because the proportionate number of blacks on the venire did not equal their composition of the population in Madison County. This issue was not presented at trial. From the record it is impossible to ascertain the racial composition of the venire, although it can be determined that the jury was struck from a panel of 64 members, of whom at least seven were black. The defendant's appellate counsel states that he "has been unable to obtain any statistics which would show the true racial composition of Madison County." Appellant's brief at 46.
"In order to establish a prima facie violation of the fair-cross-section requirement [of the Sixth Amendment], the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." Duren *Page 1222 v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664, 668,58 L.Ed.2d 579 (1979).
The defendant has also failed to establish a prima facie violation of the equal protection clause of the fourteenth amendment by proving that the jurors were selected in an intentionally discriminatory fashion, Castaneda v. Partida,430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), or a prima facie violation of fundamental fairness under the due process clause, see Hobby v. United States, 468 U.S. 339,104 S.Ct. 3093, 82 L.Ed.2d 260 (1984). The record does not even raise the inference of unconstitutional jury selection. See Ex parteWatkins, 509 So.2d 1074, 1076-77 (Ala.), cert. denied,484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987) ("The defendant cannot successfully argue that error is plain in the record when there is no indication in the record that the act upon which error is predicated ever occurred.").
 II.
The record does show that the defendant's rights underBatson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69
(1986), and Ex parte Branch, 526 So.2d 609 (Ala. 1987), were not violated by the prosecutor's exercise of two of his peremptory strikes to remove black veniremembers.
The prosecutor's stated reasons for striking each veniremember were racially neutral. One veniremember admitted that he and the defendant had mutual friends and that this would affect his ability to serve. The other black veniremember had previously been arrested for assault and resisting arrest.Scales v. State, 539 So.2d 1074, 1075 (Ala. 1988) (prior arrest record); Levert v. State, 512 So.2d 790, 795 (Ala.Cr.App. 1987) (juror not sure she could be fair and impartial); State v.Guillory, 544 So.2d 643, 650 (La.App.), cert. denied,551 So.2d 1334 (La. 1989) (shared the same friends).
 III.
The defendant argues that his conviction is not supported by the evidence because, he argues, that evidence does not show that he knowingly and unlawfully entered his wife's residence with the intent to commit the crime of murder. He contends that he is not guilty of burglary because, he argues, he was licensed or privileged to enter the marital residence. This issue of whether one spouse may burglarize the residence of the estranged spouse is one of first impression in Alabama.
The trial judge's "finding of facts summarizing the crime" are supported by the record:
 "The victim in this case, Ruby White, was the estranged wife of the defendant, Leroy White. The parties had separated during the month of August or September, 1988, when Ruby White left the marital dwelling at 2217 Evans Drive, Huntsville, Alabama, and moved into a shelter for abused spouses. During previous difficulties between the defendant and his wife, the defendant had shot her in the leg.
 "Following their separation, Ruby White employed an attorney and filed a petition for divorce. A pendente lite hearing was scheduled at which time the defendant and Ruby White verbally agreed that the defendant would move out of the dwelling at 2217 Evans Drive and would allow Ruby White and her two children to return to the dwelling. The residence at 2217 Evans Drive was owned solely by Ruby White prior to her marriage to the defendant.
 "After her return to 2217 Evans Drive, Ruby White changed the door locks and her sister, Stella Lanier, moved in with Ruby and her two children. The children were Brian Smith, age 16, son of Ruby White and a former husband [John Smith] and Latonia White, age 17 months, daughter of Ruby White and Leroy White.
 "On the afternoon of October 17, 1988, the defendant, Leroy White, purchased a shotgun from Blue Springs Pawn Shop. After purchasing the shotgun, he went to Larry's Pawn Shop and purchased *Page 1223 
some double-aught shotgun shells. After making these purchases, the defendant drove to the home of Ruby White at 2217 Evans Drive. The testimony indicated that the defendant had been drinking alcoholic beverages during the day. On his first arrival at the home on Evans Drive, the defendant pulled his car into the driveway and almost ran over his 17 month old daughter. Stella Lanier observed this and the defendant and Stella got into an argument about his driving. The defendant then placed his daughter in the car and drove off.
 "At approximately 5:15 p.m. the defendant returned to the Evans Drive residence of his wife and exited his vehicle armed with a [12 gauge] shotgun and a [.38 caliber] pistol. Ruby and Stella observed the defendant pull up and get out of his car with the shotgun and pistol. They went into the house and locked the doors. Brian Smith was sent to a rear bedroom by his mother and told to hide under the bed. Latonia White was still in the defendant's car.
 "The defendant then came up to the front door of 2217 Evans Drive and finding it locked, shot the glass out of the storm door and shot the lock off the wooden front door. He then kicked the door open, entered the house and began to scuffle with Ruby and her sister, Stella. As Stella tried to flee the house, the defendant ran out on the front porch and shot four times. Stella fell in the yard [having been wounded in her right arm and right leg].
 "The defendant then went back in the house and confronted Ruby who was begging and pleading for her life. After a brief confrontation, Ruby ran out into the front yard at which time the defendant told her to stop or he would blow her legs off. She stopped and the defendant confronted her with the shotgun. Ruby grabbed the barrel of the shotgun and continued to plead for her life. Her daughter Latonia was in the defendant's car and her son Brian was in the house.
 "Finally, the defendant shoved Ruby away from the gun and fired at her at point blank range with the double-aught buckshot. The blast tore the flesh from her right arm as she tried to shield herself and the pellets penetrated her chest and abdomen. Ruby fell to the ground moaning but she was not dead. Testimony revealed that the defendant then went back into the house and called for Brian to come out of his hiding place. When Brian came out, the defendant told him to tell his daddy that '. . . when I get out of this, I'm going to kill him, too.'
 "The defendant then went back outside, walked up to where Ruby lay on the ground moaning and said, 'Bitch, you ain't dead yet.' He then went to his car, re-loaded the shotgun, picked up his 17 month old daughter and walked back over to where Ruby lay on the ground. As he placed the muzzle of the shotgun to her neck, he said, 'Bitch, this is the last thing you will see." He then smiled and pulled the trigger.
 "The blast tore a hole in Ruby's neck where the gun shot entered and blew off the back side of her head where it exited.
 "At this time, the police arrived and the defendant surrendered without incident."
In Alabama, "[b]urglary, like trespass, is an offense against the possession, and hence the test for the purpose of determining in whom the ownership of the premises should be laid in an indictment is not the title, but the occupancy or possession at the time the offense was committed." Hamilton v.State, 283 Ala. 540, 545, 219 So.2d 369, 374, cert. denied,396 U.S. 868, 90 S.Ct. 134, 24 L.Ed.2d 121 (1969) (quoting Fullerv. State, 28 Ala. App. 28, 30, 177 So. 353, 354 (1937)). "A person 'enters or remains unlawfully' in or upon premises when he is not licensed, invited or privileged to do so." Ala. Code 1975, § 13A-7-1(4). Under Alabama law, a person who is licensed or privileged to enter premises cannot commit criminal trespass or burglary. Johnson v. State, 473 So.2d 607, 609
(Ala.Cr.App. 1985). *Page 1224 
At the time of the crime, the defendant and his wife were separated. The wife had filed for divorce and a court hearing had been set for September 23, 1988, for the purpose of forcing the defendant out of the marital residence. On the day of the scheduled hearing, the defendant and his wife, represented by their lawyers, negotiated a settlement. The defendant agreed to vacate the house and did so the very next day, taking all of his belongings with him. On that day, September 24, the victim changed the locks on her house. The defendant physically abused his wife, and, immediately prior to September 24, for a period not exceeding 30 days, the victim had been living in a shelter for abused women. The defendant did not live at the residence from September 24 until October 17, the day of the murder.
In his oral charge, at the guilty phase of the trial, the trial court instructed the jury:
 "Ladies and gentlemen, I am going to instruct you that where the husband and wife have in fact separated, if they have, and that's for you to decide, and where they are living separate and apart, each having their own separate dwelling, and the parties have communicated that fact to each other, then one spouse would have no right to enter the other's separate dwelling without consent solely because they were married, solely because of this marital relationship or this right of consortium. That alone would not authorize such conduct. Stated another way, when the husband and wife have separated and have established separate dwellings, neither the marital relationship nor the right of consortium would, standing alone, authorize the non-consensual entry by one spouse into the other's separate dwelling. Of course, that's for you to decide. The law of this state does not prohibit a finding by a jury that one spouse unlawfully entered the separate dwelling of another spouse when they are in fact separated and living separate and apart."
The law in this regard is stated in 12A C.J.S.Burglary § 38 at 230 (1980):
 "Some authorities broadly state that a man cannot burglarize his wife's home, and it is considered that the burglary statute is not designed to protect against entries by persons occupying a marital or immediate familial relationship with the legal possessor of property. So, it is held that in the absence of a legal separation agreement, or restraining order, or court decree limiting or ending the consortium rights of the parties, each spouse has a legal right to be with the other spouse on premises possessed by either or both spouses so long as the marriage exists, and entry onto such premises by either spouse cannot be a burglary, although a court order will negate any rights to enter the premises." (Footnotes omitted.)
While "the offense [of burglary] is not committed by one who breaks and enters his own dwelling or other building,"Stanley v. State, 57 Ala. App. 83, 84, 326 So.2d 148, 149
(1976); Wilson v. State, 247 Ala. 84, 85, 22 So.2d 601, 602
(1945), "[i]t has, however, also been held that the mere existence of the marriage relationship does not preclude the one spouse from committing burglary against the other spouse." 12A C.J.S. Burglary § 38 (1990 Supp.) (footnote omitted).
We agree with the holding of the Florida Supreme Court inCladd v. State, 398 So.2d 442, 443-44 (Fla. 1981):
 "The sole issue presented for review is whether a husband, who is physically but not legally separated from his wife, can be guilty of burglary when he enters premises, possessed only by the wife and in which he has no ownership or possessory interest, without the wife's consent and with intent to commit an offense therein. . . . We hold that . . . under the particular facts of this case, the defendant could be guilty of burglary of his estranged wife's apartment. . . .
 "The factual situation is narrow. The defendant and his wife had been separated for approximately six months, although there was no formal separation *Page 1225 
agreement or restraining order. He had no ownership or possessory interest in his wife's apartment and had at no time lived there. One morning, he broke through the locked door of her apartment with a crowbar, struck her, and attempted to throw her over the second floor stair railing. . . .
". . . .
 "We reject the defendant's contention that the marriage relationship and the right of consortium deriving therefrom preclude the State from ever establishing the nonconsensual entry requisite to the crime of burglary. . . . Since burglary is an invasion of the possessory property rights of another, where premises are in the sole possession of the wife, the husband can be guilty of burglary if he makes a nonconsensual entry into her premises with intent to commit an offense, the same as he can be guilty of larceny of his wife's separate property. In State v. Herndon, 158 Fla. 115, 27 So.2d 833 (1946), discussing a wife's separate property rights, we held that a husband could be charged with the larceny of his wife's separate property, and we explained:
 "In a society like ours, where the wife owns and holds property in her own right, where she can direct the use of her personal property as she pleases, where she can engage in business and pursue a career, it would be contrary to every principle of reason to hold that a husband could ad lib appropriate her property. If the common-law rule was of force, the husband could collect his wife's pay check, he could direct its use, he could appropriate her separate property and direct the course of her career or business if she has one. We think it has not only been abrogated by law, it has been abrogated by custom, the very thing out of which the common law was derived.
 "27 So.2d. at 835. The defendant's consortium rights did not immunize him from burglary where he had no right to be on the premises possessed solely by his wife independent of an asserted right to consortium."
This principle is supported by additional authority:
 "We reject the position that there is any absolute right on the part of one spouse to be with the other against the other's wishes, giving a right to break into the home of the other with the intent to commit a crime. We adopt the position of the Florida court in Cladd v. State, Fla., 398 So.2d 442 (1981), of the Ohio court in State v. Herrin, 6 Ohio App.3d 68, 453 N.E.2d 1104
(1982), and of the Washington court in State v. Schneider, 36 Wn. App. 237, 673 P.2d 200 (1983), all of which hold that burglary is an invasion of the possessory right of another and extends to a spouse."
Matthews v. Commonwealth, 709 S.W.2d 414, 420 (Ky. 1985), cert. denied, 479 U.S. 871, 107 S.Ct. 245, 93 L.Ed.2d 170 (1986).
A number of authorities are cited in Parham v. State,79 Md. App. 152, 161, 556 A.2d 280, 284-85 (1989):
 "The only evidence on the status of the property in the instant case was that Queen [the defendant's wife] was in sole possession and in the process of purchasing the property in her own name, and that appellant was living with his sister and was not on the title. Appellant had separated from his wife approximately six weeks prior to the incident, having spent only a week in the West Lombard Street home before the separation. He had left very few belongings there most of his clothes were at other places.
 "While we have not had occasion to hold specifically than an estranged spouse can be convicted of burglary if the dwelling house broken into was once shared with his or her spouse, other courts have held, virtually unanimously, that the marital relationship does not preclude a conviction for burglary. We discovered no cases other than the following. *Page 1226 See Cladd v. State, 398 So.2d 442, 443 (Fla. 1981) (husband who had been separated from wife for six months with no formal separation agreement or restraining order had no ownership or possessory interest in wife's apartment and could be charged with burglary, expressly overruling Vazquez v. State, 350 So.2d 1094 (Fla.App. 1977), which held that the husband had a legal right to be with his wife on the premises occupied by her at the time of entry); Matthews v. Commonwealth, 709 S.W.2d 414, 420 (Ky. 1985) cert. denied, 479 U.S. 871, 107 S.Ct. 245, 93 L.Ed.2d 170 (1986) (husband who was under a court order in connection with a sexual abuse charge to stay away from the premises was not entitled to directed verdict on burglary charge where the evidence indicated he broke into his estranged wife's residence approximately five weeks after they had separated); Knox v. Commonwealth, 225 Va. 504, 304 S.E.2d 4, 6 (1983) (husband separated from wife for approximately six months had no proprietary interest in wife's apartment and could be charged with burglary); State v. Dively, 431 N.E.2d 540, 543 (Ind.App. 1982) (mere fact of conjugal status does not preclude a spouse from committing burglary against the other spouse); State v. Woods, 526 So.2d 443, 445 (La.App. 1988) (Louisiana's community assets rule did not preclude a burglary conviction of husband of apartment tenanted by legally separated wife); State v. Cox, 73 N.C. App. 432, 326 S.E.2d 100, 102-03, cert. denied, 313 N.C. 605, 330 S.E.2d 612 (1985) (evidence which established that husband had been separated from his wife without separation agreement for more than a year prior to offense and wife repeatedly refused permission for husband to enter her residence was sufficient to sustain conviction for burglary); State v. Schneider, 36 Wn. App. 237, 673 P.2d 200, 203-04 (1983) (sufficient evidence to convict wife who had been separated from husband for nine months of conspiracy to burglarize husband's residence where the wife was not living at residence at the time of offense). But see State v. Weitzel, 112 Ohio App. 300, 168 N.E.2d 550, 551 (1960) (stating that a man cannot burglarize his wife's home, but State v. Herrin, 6 Ohio App.3d 68, 453 N.E.2d 1104, 1106
(1982), seemingly contradicts Weitzel in holding that husband who was separated from wife for 12 years committed burglary even though he and his wife owned the house). The common thread running through these cases is that the mere existence of the marriage relationship does not put a spouse's separate property beyond the protection of the law and subject to the depredation of the other spouse. See Dively, 431 N.E.2d at 543.
 "Given the evidence, a rational trier of fact could have found beyond a reasonable doubt that appellant neither had a possessory interest in the residence nor had a right to be in the residence at the time he entered. We hold the evidence is sufficient to sustain appellant's conviction for burglary." (Footnotes omitted.)
While this is an issue of first impression in this state, there is case law which tends to support our holding. InCook v. Cook, 125 Ala. 583, 584-85, 27 So. 918 (1900), the Alabama Supreme Court stated:
 "That a wife must sue alone for the recovery of her separate property is expressly provided by statute. Code, § 2527 [Ala. Code 1975, § 30-4-11]. That she may sue her husband for the recovery of personal property belonging to her has been expressly decided. Bruce v. Bruce, 95 Ala. 563, 11 So. 197. The right to sue her husband to recover from him possession of her realty rests upon the same statutory provision and the same principles declared in the case cited as to her personalty, and can no more be denied in respect of one class of property than in respect of the other. Nor is it of consequence that the land of which recovery is sought was at one time occupied by the husband and wife with their children as a homestead, nor that the *Page 1227 
defendant at the time of the trial is willing, and all along has been, for the wife to return to this homestead and occupy it jointly with him. He has no right to compel her to let him into joint possession or occupation of any of her land, nor any right to exclude her from the possession and occupation altogether unless she assents to joint possession and occupation with him. There is no law to compel a wife to live with her husband on her land or on his. There is no legal prohibition upon her separating from him and living apart. And, having separated from him and left her home in his possession, she is entitled to recover it from him, as if he were a stranger. To hold otherwise would be to give the husband rights and estates in the wife's lands which our statutes not only do not provide for, but expressly provide against."
See also Holman v. State, 495 So.2d 115 (Ala.Cr.App. 1986) (evidence that the defendant had been kicked out of his girlfriend's residence where he had been living, that he had telephoned the residence and asked to be allowed to come back, and that he had been denied permission demonstrated that any license or privilege which he had to enter the residence had been terminated before he broke and entered, thus permitting a conviction for burglary).
Based upon the above authorities, we find that the evidence supports the jury's finding that the defendant was guilty of burglary in the first degree as a component of the capital offense charged in the indictment.
 IV.
The defendant argues that his confessions should not have been admitted into evidence because, he says, he was too intoxicated to make a voluntary, knowing, and intelligent waiver of his constitutional rights.
The shooting occurred at approximately 5:15 on the afternoon of October 17, 1988, and the defendant was immediately taken into police custody. The defendant gave two statements to the police. He was interrogated by Huntsville Police homicide investigator Mickey Lee Brantley, who testified that he informed the defendant of his constitutional rights at 8:34 that same night. Brantley also stated that, in his first statement, the defendant claimed that on the day of the shooting he had consumed "four to six beers, a pint of dry gin, and about three or four ounces of Old Forester liquor." In his second statement, which was tape-recorded, the defendant stated, "I've had several beers, approximately six or seven or eight. I don't know. I dranked a pint of extra dry Seagram, extra dry gin, and a few shots of Old Forester."
Investigator Brantley testified that in his opinion the defendant was not intoxicated. Brantley said he could not smell any alcoholic beverage on the defendant. He testified that the only thing that would cause him to think that the defendant had been drinking was the fact that "his eyes were somewhat bloodshot." The investigator stated that the defendant's speech was slow but that he "was very precise in the way he said things. He seemed to be thinking about what he was saying. He seemed to be very aware of what he was saying."
Stella Lanier, the victim's sister, was present at the time of the crime. She argued with the defendant and observed his actions. She testified that the defendant was not "drunk" but that the defendant "was under the influence of alcohol. He was drinking."
The defendant did not testify at trial and there was no testimony presented to rebut Investigator Brantley's testimony.
The trial court properly determined that the defendant's confessions were voluntary. "[U]nless intoxication, in and of itself, so impairs a defendant's mind that he is 'unconscious of the meaning of his words,' the fact that the defendant was intoxicated at the time he confessed is simply *Page 1228 
one factor to be considered when reviewing the totality of the circumstances surrounding the confession." Carr v. State,545 So.2d 820, 824 (Ala.Cr.App. 1989). "The intoxicated condition of an accused when he makes a confession, unless it goes to the extent of mania, does not affect the admissibility in evidence of the confession, but may affect its weight and credibility."Callahan v. State, 557 So.2d 1292, 1300 (Ala.Cr.App.), affirmed, 557 So.2d 1311 (Ala. 1989).
 V.
We reject the defendant's argument that the introduction of Investigator Brantley's testimony concerning the unrecorded confession, in addition to the playing of the recorded confession, constitutes prejudicial error.
The first statement the defendant gave to Brantley was not tape-recorded. Immediately after that statement, the defendant agreed to give a tape-recorded statement to Investigator Brantley. The State proved that both statements were made after the defendant had knowingly, intelligently, and voluntarily waived his constitutional rights. "Admission of cumulative testimony is within the sound discretion of the trial judge. Even though such evidence may tend to inflame the jury, its admissibility will not be affected if it sheds light upon a material inquiry or illustrates the transaction at issue."Allen v. State, 290 Ala. 339, 343, 276 So.2d 583, 586 (1973).
 VI.
The defendant's argument that the prosecution violated the pretrial discovery order of the trial court by not informing defense counsel of the contents of the defendant's first statement to Investigator Brantley is simply not supported by the record. There is nothing in the record to dispute or contradict the prosecutor's statement to the trial court that defense counsel had been given a copy of Brantley's summation of the first confession.
 VII.
The defendant argues that the use of "burglary" as the aggravating component of the intentional killing of the capital offense is improper where the only motive for the burglary is the commission of the crime of murder.
This "overlap" is constitutionally permissible. "[T]he fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm." Lowenfield v. Phelps, 484 U.S. 231,246, 108 S.Ct. 546, 555, 98 L.Ed.2d 568 (1988). See Kuenzel v.State, 577 So.2d 474, 487 (Ala.Cr.App. 1990), and cases cited therein. In Duncan v. State, 436 So.2d 883, 904-05
(Ala.Cr.App. 1983), cert. denied, 464 U.S. 1047, 104 S.Ct. 720,79 L.Ed.2d 182 (1984), this Court rejected the contention that "the legislature did not intend § 13A-5-31(a)(4), Code of Alabama 1975 [now § 13A-5-40(a)(4)] to be applied except in cases where the burglary 'was unrelated to and not for the purpose of the killing itself.' " See also State v. Monroe,397 So.2d 1258, 1273-74 (La. 1981), cert. denied, 463 U.S. 1229,103 S.Ct. 3571, 77 L.Ed.2d 1411 (1983). Neither Proffitt v.Wainwright, 685 F.2d 1227 (11th Cir. 1982), cert. denied,464 U.S. 1002, 104 S.Ct. 508, 78 L.Ed.2d 697 (1983), nor McKinneyv. State, 511 So.2d 220 (Ala. 1987), cited by the defendant, supports an argument to the contrary.
 VIII.
The defendant argues that improper and prejudicial remarks by the prosecutor during the guilt phase of the trial prevented him from obtaining a fair trial.
The prosecutor's comments concerning the marital and domestic "troubles" the defendant and his wife had experienced, that fact that Mrs. White had been living in a shelter for battered women, that the defendant "literally run Ruby White out of her own residence," and that Mrs. White and her sister "locked themselves in that residence" with "good reason" to take *Page 1229 
"sanctuary" are fully supported by the facts in evidence. See Part X of this opinion. These comments were based on facts in evidence and were entirely proper. See Emerson v. State,281 Ala. 29, 35, 198 So.2d 613, 618 (1967). "The test of legitimate argument is that whatever is based on a fact or facts in evidence is within the scope of proper comment in argument to the jury." Kirkland v. State, 340 So.2d 1139, 1140
(Ala.Cr.App. 1976), cert. denied, 340 So.2d 1140 (Ala. 1977).
The prosecutor's remark that if the jury did not find the defendant guilty he would probably "get" John Smith was based on the testimony of Brian Smith, the son of John Smith and the defendant's stepson. Brian testified that after the defendant had shot his mother, the defendant told Brian, "I ain't going to hurt you. Just tell your daddy when I get out of this I'm going to kill him." There was evidence that the defendant went to his wife's residence to kill John Smith and his wife. Contrary to the defendant's argument, the prosecutor did not make any comment that the defendant would harm the jurors if they did not convict him.
In his closing argument, the prosecutor stated:
 "Ladies and gentlemen, in just a few short weeks the school year will begin again and, at least in my house, that's a great time with a first grader, the same age as perhaps the 20 or so students of Ruby White. The very young children she was teaching to read that year will no doubt read or hear about your verdict in this case, and as young people do will ask a very penetrating question of what happened to the man who did that to their teacher, and ask in a way that maybe we can't, what justice is in a case of this kind."
There was no objection to these comments.
The prosecutor's argument is subject to criticism because it is not completely based on the facts in evidence or the reasonable and legitimate inferences to be drawn from those facts. There was evidence that the victim taught the first grade. However, there was no evidence of how many students she taught, what subjects she taught, or that the prosecutor had a "first grader." While we discourage such argument, the above comment is in the nature of an appeal to the jury to enforce the law. "In Alabama, the rule is that a district attorney in closing argument may make a general appeal for law enforcement." Ex parte Waldrop, 459 So.2d 959, 962 (Ala. 1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323
(1985). See Soriano v. State, 527 So.2d 1367, 1371 (Ala.Cr.App. 1988). "In making appeals for law enforcement, the attorney for the prosecution does well to avoid making a statement that purports to convey to the jury information as to facts not shown by the evidence and emanating solely from the mind of counsel." Moberg v. State, 385 So.2d 74, 78 (Ala.Cr.App. 1980). Considered within the context of the prosecutor's lengthy argument, we do not find the prosecutor's comments to constitute plain error or to be so egregious or obvious as to "seriously affect the fairness or integrity of the judicial proceedings." Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983). The test for determining whether the prosecutor's statements during the trial were prejudicial is "whether, taken as a whole in the context of the entire case, the statements prejudicially affected substantial rights of the defendant." United States v.Long, 674 F.2d 848, 855 (11th Cir. 1982). We find no basis for reversal on this issue.
 IX.
We do not consider the prosecutor's references in closing arguments to the defendant as "cold" and "unfeeling" as improper. In fact, these characterizations are supported by the evidence of the manner in which the defendant committed the crime. We consider them accurate descriptions of the defendant's conduct. See *Page 1230 
Parts XVI and XVII of this opinion. The prosecutor's comments were proper. Barbee v. State, 395 So.2d 1128, 1134-35
(Ala.Cr.App. 1981).
 X.
The defendant argues that the repeated comments and references to the fact that the victim was in a shelter for battered women, in addition to the evidence that the defendant had shot her in the leg on a prior occasion, constituted ineradicable, prejudicial, and reversible error. There was no objection to any of this testimony and most of it was elicited by defense counsel. In a prosecution for murder, evidence of former acts of hostility between the accused and the victim are admissible as tending to show malice, intent, and ill will on the part of the accused. Bennefield v. State, 281 Ala. 283,286, 202 So.2d 55, 58 (1967); Blue v. State, 246 Ala. 73, 81,19 So.2d 11, 18 (1944). "In a prosecution for the murder of a wife by her husband, their general relations toward each other and evidence of actual cruelty by the defendant upon his wife prior to the shooting are admissible on the question of whether the shooting was intentional or accidental . . . and on the questions of malice and intent." Akers v. State, 399 So.2d 929,931 (Ala.Cr.App. 1981) (citations omitted).
 XI.
The defendant argues that the trial court erred in failing to instruct the jury on the lesser included offense of manslaughter defined in Ala. Code 1975, § 13A-6-3(a)(2): "He causes the death of another person under circumstances that would constitute murder under § 13A-6-2; except, that he causes the death due to a sudden heat of passion caused by provocation recognized by law, and before a reasonable time for the passion to cool and for reason to reassert itself."
The trial court charged the jury on the lesser included offenses of murder and reckless manslaughter. The failure to charge on sudden heat of passion manslaughter does not constitute plain error because there is no evidence of "provocation." "To constitute adequate legal provocation, it must be of a nature calculated to influence the passions of the ordinary reasonable man." Biggs v. State, 441 So.2d 989, 992
(Ala.Cr.App. 1983). "In the case at bar, no adulterous affair was discovered at the time of the shooting nor was there any mention by deceased of any past specific act of adultery. Mere suspicion, belief or knowledge of past adulterous affairs will not change the character of a homicide from murder to manslaughter." Biggs, 441 So.2d at 992.
Furthermore, the evidence shows that the killing was not due to any "sudden heat of passion." The evidence shows that the defendant deliberately planned and prepared to kill his wife that afternoon before he ever arrived at her residence.
 "The law has declared, and can declare, no length of time, within which the manslayer must deliberate, or premeditate, to raise the offense to the highest grade of homicide, murder in the first degree. If the mind reasons about, or resolves upon the act, before committing it, or if the purpose be formed, no matter for how brief a period, on an event then future, or on a contingency that may happen, to use a deadly weapon, this is deliberation, premeditation; and a homicide, committed pursuant thereto, is murder in the first degree."
Ex parte Brown, 65 Ala. 446, 447-48 (1880).
We also note that any error in instructing the jury on the offense of reckless manslaughter was harmless because the jury found the defendant guilty of an intentional killing. Cf.Ex parte Jordan, 486 So.2d 485, 489 (Ala. 1986) ("Although the jury was given the opportunity to apply the elements of manslaughter and criminally negligent homicide to the facts of this case, the jury rejected these theories to *Page 1231 
reach a verdict of guilty on the greater offense of murder. Therefore, we must logically conclude that an instruction on vehicular homicide, although proper, would not have affected the outcome of this case.").
 XII.
The defendant argues that the jury should have been charged on the lesser included offense of felony-murder.
"[A] death sentence may not be imposed after a jury verdict of guilt of a capital offense when the jury is not permitted to consider a verdict of guilt of a lesser included offense, when the evidence would have supported such a verdict." Beck v.State, 396 So.2d 645, 647 (Ala. 1980). Here, the evidence does not support a verdict of felony-murder.
"[T]he purpose of the felony-murder doctrine is to hold felons accountable for unintended deaths caused by their dangerous conduct." W. LaFave and A. Scott, 2 SubstantiveCriminal Law § 7.5 at 210 (1986). See Ex parte Ritter,375 So.2d 270, 273-74 (Ala. 1979), vacated on other grounds,448 U.S. 903, 100 S.Ct. 3044, 65 L.Ed.2d 1133 (1980); Ex parteBates, 461 So.2d 5, 7 (Ala. 1984). Here, the evidence shows that the defendant intentionally killed his wife. There is no rational basis for a verdict convicting him of felony-murder. §13A-1-9(b).
 XIII.
Contrary to the defendant's argument, the trial court did not instruct the jury on the offense of reckless murder. There was no violation of the holding of Ex parte Washington,448 So.2d 404 (Ala. 1984).
 XIV.
"[T]he instructions of the trial court accurately informing a jury of the extent of its sentencing authority and that its sentence verdict was 'advisory' and a 'recommendation' and that the trial court would make the final decision as to sentence does not violate Caldwell [v. Mississippi, 472 U.S. 320,105 S.Ct. 2633, 86 L.Ed.2d 231 (1985)]." Martin v. State,548 So.2d 488, 494 (Ala.Cr.App. 1988), affirmed, 548 So.2d 496 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383
(1989). See also Kuenzel v. State, 577 So.2d 474, 502
(Ala.Cr.App. 1990); Hooks v. State, 534 So.2d 329, 357-60
(Ala.Cr.App. 1987), affirmed, 534 So.2d 371 (Ala. 1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989);Ex parte Hays, 518 So.2d 768, 777 (Ala. 1986), cert. denied,485 U.S. 929, 108 S.Ct. 1099, 99 L.Ed.2d 262 (1987).
 XV.
The jury, by a vote of nine for and three against, recommended that the defendant be sentenced to life imprisonment without the possibility of parole. In its sentencing order imposing the death penalty, the trial court stated:
 "The Court has carefully weighed the aggravating and mitigating circumstances which it finds to exist in this case, and has given consideration to the recommendation of the jury contained in its advisory verdict. While the mitigating circumstances and the jury's recommendation of life without parole have been heavily considered by the Court, it is the judgment of this Court that such are outweighed by the aggravating circumstances of this offense. Accordingly, it is ORDERED, ADJUDGED AND DECREED by this Court that the defendant shall be punished by death."
The defendant's argument that the United States Constitution requires the adoption in Alabama of the rule of Tedder v.State, 322 So.2d 908, 910 (Fla. 1975), that in order to sustain a sentence of death following a jury recommendation of life, the facts suggesting a sentence of death must be so clear and convincing that virtually no reasonable person could differ, was rejected by the Alabama Supreme Court in Ex *Page 1232 parte Jones, 456 So.2d 380, 381-82 (Ala. 1984), cert. denied,470 U.S. 1062, 105 S.Ct. 1779, 84 L.Ed.2d 838 (1985).
In support of his argument that the trial court improperly rejected the sentence recommendation of the jury, the defendant cites the fact that in his oral findings at the close of the sentence hearing, the trial judge erroneously stated that the presentence investigation report "reveals that you were dishonorably discharged from the Army for aggravated assault." The trial judge was considering this in connection with the mitigating circumstance of no significant history of prior criminal activity, which the trial court did find to exist. However, when this error was called to the trial judge's attention by defense counsel, the trial judge acknowledged his "mistake" and noted that the presentence investigation report did state that the defendant "received a general discharge."
In the trial court's written findings made pursuant to §13A-5-47(d), the trial court, in finding the existence of the mitigating circumstance of no significant history of prior criminal activity, commented: "The Court also notes from the pre-sentence report that the defendant was discharged from the Army because of his involvement in an aggravated assault." The presentence investigation report states: "White was in the United States Army from 1977 to 1981. He was given a general discharge in 1981 after having been Court Martialed for Aggravated Assault." Because the trial court corrected its "mistake," we reject this ground of the defendant's argument that the trial court improperly overrode the sentence recommendation of the jury.
 XVI.
The trial court was correct in finding as an aggravating circumstance the fact that the defendant knowingly created a great risk of death to many persons under Ala. Code 1975, §13A-5-49(3). The finding of the trial court in this regard is stated in the following portion of the trial judge's "findings concerning the existence or non-existence of aggravating circumstances."
 "The evidence in this case indicates that the defendant indiscriminately fired a shotgun into an occupied dwelling containing not only the victim but two other people. The evidence also indicates that the defendant fired the pistol out in the front yard in a residential neighborhood where many other people were present. The Court finds that the defendant's conduct in the indiscriminate firing of these weapons did, in fact, create a great risk of death to many other people."
In addition to the written findings of the trial court, in imposing the sentence of death, the trial court stated in open court at the conclusion of the sentencing hearing:
 "In this case the evidence at the trial was to the fact that you were firing a shotgun with double 0 buckshot in it and a pistol rather indiscriminately into a house that was occupied by several people. You shot that pistol and shotgun in the yard and neighborhood where other people were present. That does to me appear to be evidence of that aggravating circumstance."
The defendant's argument that "the only persons who were in danger of 'great risk of death' were the two women who were actually injured," Appellant's brief at 120, is without factual support and is contrary to the facts of this case.
The evidence fully supports the trial court's findings and the application of this aggravating circumstance. SeeEdwards v. State, 515 So.2d 86, 92-93 (Ala.Cr.App. 1987).
 XVII.
The trial court properly found as an aggravating circumstance, under § 13A-5-49(8), the fact that the defendant's conduct "was especially heinous, atrocious and cruel." In this regard, the trial court found: *Page 1233 
 "The Court reaches this conclusion [that the capital offense was especially heinous, atrocious and cruel compared to other capital offenses] based upon the following evidence:
 "a. The victim of this crime was completely defenseless and was begging and pleading for her life during the commission of the offense.
 "b. The children of the victim were present when the killing occurred and certainly the victim suffered extreme concern for their safety as evidenced by her instructing Brian to hide under the bed.
 "c. The victim witnessed the apparent killing of her sister prior to her own death.
 "d. The victim obviously realized that it was the defendant's intent to kill her when she saw him drive up and exit his car armed with a pistol and a shotgun. Even though she locked the doors, this did not prevent his entry into the dwelling.
 "e. The victim obviously suffered extreme pain when she was initially shot by the defendant. This gun blast removed the flesh from the bone of her right arm and the pellets which entered her body, according to the testimony of the forensic pathologist would have caused extremely severe pain.
 "f. After inflicting this obvious severe injury to the victim, she was left lying on the ground while the defendant entered the house to confront her minor child, Brian Smith.
 "g. The most brutal aspect of the defendant's conduct occurred when, after he realized the victim was not dead, he calmly went to his car, re-loaded the shotgun and returned to the severely wounded victim with their 17 month old daughter in his arms and said to her, 'This is the last thing you will see.'
 "The Court finds that this was a conscienceless and pitiless killing which was unnecessarily torturous. By any standard acceptable to civilized society, this crime was extremely wicked and shockingly evil. It was perpetrated under circumstances which had to cause a high degree of pain to the victim and the evidence indicates that there was utter indifference on the part of the defendant to this pain. The Court recognizes that all capital offenses are heinous, atrocious and cruel to some extent, but the degree of heinousness, atrociousness and cruelty which characterizes this offense exceeds that which is common to all capital offenses."
In open court at the conclusion of the sentencing hearing, the trial court stated:
 "This wasn't just a killing. It had to be a horrifying and terrifying experience for your wife to see you drive up, get out of your car with a shotgun and a pistol. I think that is evident from what she did and what her sister did when they saw you, and that was to go in the house and lock the door and send her child to hide under the bed. I think that is evidence that she knew what was happening. As I stated, that had to be a horrifying and terrifying experience.
 "It had to be a horrifying and terrifying experience to her when you shot the door off, when you shot the lock off the door, and kicked it open. You then went in and confronted your wife. As I recall, you fired the shotgun at her sister, or fired it down the hallway. When Stella Lanier tried to flee the residence you went out on the porch and shot at her and, according to what testimony you believe, you shot up to four times. She fell in the yard. Your wife witnessed that. You then went back in the house and confronted her and, although I don't recall the exact words that you said, it was something to the effect that, 'You have made me kill your sister,' or 'I have had to kill your sister, and now I have *Page 1234 
got to kill you.' It was some words to that effect. With her standing there begging and pleading for her life, with her child in the bedroom hidden under the bed, and your child out in the car, she then tried to flee the residence, obviously terrified. She ran out in the yard, whereupon, as I recall, you told her to stop or you would shoot her legs off. Then you confronted her in the yard. With her begging and pleading for her life, she grabbed the shotgun, as I recall, the barrel of it, and eventually you shoved her away and at point blank range fired a shot. That gun with double 0 buckshot tore the flesh from her arm and the pellets penetrated her body in areas, according to the forensic pathologist, that would cause extreme pain to her. She fell to the ground moaning. She was not dead at that point. I don't think that's disputed.
 "You left her lying in the yard and went back in the house. At this point we will never know whether she was conscious of what you were doing or not. She may have been. She may have seen you go back in the house where her child was hiding under the bed. You confronted her son and made your statement to him concerning what you were going to do to his father.
 "You then came back out. You realized that she was not dead. In the presence of her daughter and other people there in the neighborhood, and with her lying on the ground, mortally wounded, in pain, completely defenseless, you placed the shotgun at her neck and pulled the trigger. If that is not especially heinous or atrocious and cruel, I don't know what is."
The findings of the trial court are fully supported by the testimony and evidence and fully justify the finding of this aggravating circumstance.
Pursuant to and following our decision in Bui v. State,551 So.2d 1094, 1119-20 (Ala.Cr.App. 1998), 551 So.2d 1125
(Ala. 1989), we find that the application of the aggravating circumstance that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses was both proper and constitutional under the facts of this case. Evidence as to the fear experienced by the victim before death is a significant factor in determining the existence of the aggravating circumstance that the murder was heinous, atrocious, and cruel. Ex parte Whisenhant, 555 So.2d 235,243-44 (Ala. 1989), cert. denied, ___ U.S. ___, 110 S.Ct. 3230,110 L.Ed.2d 676 (1990).
 XVIII.
In imposing the sentence of death, the trial court's consideration of the presentence investigation report and the victim impact statements was not improper in this particular case. Ex parte Martin, 548 So.2d at 497-98; Kuenzel, 577 So.2d at 526-527.
Both the "victim impact" section of the presentence investigation report and the "victim's impact report" itself are favorable to the defendant in that both statements indicate only that the victim's aunt, Mrs. Rosie Garth, considered life without parole to be a proper punishment. In this case, the victim impact statements did not contain any information concerning the victim's personal characteristics and did not contain any detailed or significant information concerning the emotional impact of the crime on any relative or friend of the victim. Compare, Pierce v. State, 576 So.2d 236
(Ala.Cr.App. 1990).
 XIX.
The defendant argues that the aggravating circumstance that the capital offense was committed while the defendant was engaged in the commission of a burglary under § 13A-5-49(4) is, by itself, insufficient to support the imposition of the *Page 1235 
death penalty. Since we have rejected the defendant's arguments that the aggravating circumstances that the defendant created a great risk of death to many persons and that the crime was especially heinous, atrocious, or cruel were improper, see Parts XVI and XVII of this opinion, the present argument is without merit. Furthermore, in Part VII, we concluded that the aggravating circumstance that the capital offense was committed while the defendant was engaged in the commission of burglary, § 13A-5-49(4), was proper as an element of the capital offense. Since we have invalidated no aggravating circumstance applied by the trial court, Proffitt v. Wainwright, 685 F.2d 1227, 1268
(11th Cir. 1982), cert. denied, 464 U.S. 1002, 104 S.Ct. 508,78 L.Ed.2d 697 (1983), has no application. Furthermore, Proffitt
indicates only that since the other aggravating circumstances were found invalid by the appellate court and because the sole purpose of the burglary was to commit the murder, that circumstance might not have been sufficiently aggravating, in itself, for the trial court to impose the death penalty. SeeLindsey v. Smith, 820 F.2d 1137, 1152-53 (11th Cir. 1987), cert. denied, 489 U.S. 1059, 109 S.Ct. 1327, 103 L.Ed.2d 595 (1989).
 XX.
In that portion of the defendant's brief on appeal entitled "Summary of the Argument," the defendant states: "An issue which is not briefed but which is hereby pointed out for the consideration of the court and should not be deemed to be waived is the claim of Mr. White that his counsel at the trial court level was ineffective under Strickland v. Washington,466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674] (1984)."
The defendant was represented by retained trial counsel at all stages of the proceedings in the circuit court. Although the defendant's appointed appellate counsel filed a motion for new trial, that motion does not contain an allegation of the ineffective assistance of counsel.
Despite these procedural defaults in raising and preserving this issue, this Court has carefully examined the record with regard to trial counsel's performance. Even assuming that trial counsel's failure to object or preserve an issue raised by appellate counsel constitutes an adequate showing that counsel's performance fell below an objective standard of reasonableness, there has been no demonstration of a reasonable probability, and we have found none, that counsel's deficient performance altered the outcome of the proceedings.Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052,80 L.Ed.2d 674 (1984). A strong indication of trial counsel's proficiency is the fact that the jury, despite the defendant's two damning and incontrovertible confessions, recommended a sentence of life without parole. We find no merit to the defendant's contention that he was denied the effective assistance of counsel.
 XXI.
The death sentence in this case is neither disproportionate nor excessive.
As mandated by Rule 45A, A.R.App.P., this Court has searched the record for any error which either has or probably has adversely affected any substantial right of the defendant, without regard to whether such error was preserved for review by proper and timely objection. Pursuant to the required appellate review of § 13A-5-53(a), we have searched and have found no error adversely affecting the rights of the defendant in the sentencing proceedings, and have determined that the trial court's findings concerning the aggravating and mitigating circumstances are supported by the evidence.
The trial court found the existence of the following aggravating circumstances: that the defendant knowingly created a great risk of death to many persons, that the *Page 1236 
capital offense was committed while the defendant was engaged in the commission of a burglary in the first degree, and that the capital offense was especially heinous, atrocious, or cruel. The trial court found the existence of two mitigating factors: that the defendant has no significant history of prior criminal activity and that the defendant apparently had a good reputation and good character prior to the commission of this offense.
In determining that the death sentence is the proper sentence in this case, pursuant to § 13A-5-53(b) we make the following findings and determinations.
1) We have found nothing in the record to indicate that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. In fact, the jury recommended a sentence of life without parole. The trial court rejected this recommendation only after obvious careful and thoughtful consideration.
2) Our independent weighing of the aggravating and mitigating circumstances indicates that death was the proper sentence. As was the trial court, this Court is struck by the merciless, brutal, and cold-blooded depravity of the defendant.
3) The sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. See the following capital cases involving burglary and intentional killing in which the death penalty has been imposed: Lynn v. State,543 So.2d 704 (Ala.Cr.App. 1987), affirmed, 543 So.2d 709
(Ala. 1988), cert. denied, 493 U.S. 945, 110 S.Ct. 351,107 L.Ed.2d 338 (1989); Ford v. State, 515 So.2d 34
(Ala.Cr.App. 1986), affirmed, 515 So.2d 48 (Ala. 1987), cert. denied, 484 U.S. 1079, 108 S.Ct. 1061, 98 L.Ed.2d 1023 (1988);Grayson v. State, 479 So.2d 69 (Ala.Cr.App. 1984), affirmed,479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189,88 L.Ed.2d 157 (1985); Kennedy v. State, 472 So.2d 1092
(Ala.Cr.App. 1984), affirmed, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985);Lindsey v. State, 456 So.2d 383 (Ala.Cr.App. 1983), affirmed,456 So.2d 393 (Ala. 1984), cert. denied, 470 U.S. 1023,105 S.Ct. 1384, 84 L.Ed.2d 403 (1985). See also Spears v. State,428 So.2d 174 (Ala.Cr.App. 1982) (life without parole).
The judgment of the circuit court adjudging the defendant guilty of the capital offense charged in the indictment and sentencing the defendant to death is affirmed.
AFFIRMED.
All Judges concur.