OPINION
Defendant-appellant James C. Jones appeals from his conviction and life sentence entered in the Jefferson County Common Pleas Court after a jury found him guilty of murdering his estranged wife. For the following reasons, appellant's conviction is affirmed.
 STATEMENT OF FACTS
Appellant was married to Margaret Jones with whom he had two children, ten-year-old Stephine (aka Stephanie) and eight-year-old Brandon. In early 1999, the couple separated. Appellant moved into his mother's house, leaving Ms. Jones and the children in the marital residence on Lincoln Avenue in Mingo Junction. On April 1, 1999, the court issued a temporary civil protection order in favor of Ms. Jones. On June 1, 1999, appellant entered the residence with a knife. He used this knife and a butcher knife from the kitchen to stab and slash Ms. Jones multiple times in front of the children. He then threw her down the basement stairs where she bled to death.
The grand jury indicted appellant on four counts. First, he was charged with aggravated murder for purposely causing a death during an aggravated burglary in violation of R.C. 2903.01(B). A death specification was attached to this count, alleging that the death occurred during an aggravated burglary and that appellant was the principal offender or committed the crime with prior calculation and design. Second, he was charged with aggravated burglary in violation R.C. 2911.11(A)(1) and (2). Third, he was charged with violating a protection order under R.C.2919.27 (A)(1). Fourth, he was charged with another count of aggravated murder in violation in R.C. 2903.01(A) for purposely causing a death with prior calculation and design. The death specification set forth above was also attached to this count.
The case was tried to a jury. On March 8, 2000, the jury returned guilty verdicts on all four counts. After proceeding through the penalty phase, the jury decided against a death sentence and recommended that appellant receive life in prison with no chance of parole. Subsequent to the sentencing hearing on March 23, 2000, the court agreed with this recommendation and sentenced appellant accordingly for the merged aggravated murder counts. The court also sentenced appellant to ten years for aggravated burglary and six months for violating a protection order. The within timely appeal followed. Appellant sets forth ten assignments of error.
 ASSIGNMENT OF ERROR NUMBER ONE
Appellant's first assignment of error contends:
 "THE TESTIMONY OF PAULA YATES SHOULD HAVE BEEN EXCLUDED DUE TO HER NOT BEING QUALIFIED AS AN EXPERT IN THE AREA OF MOLECULAR BIOLOGY."
The state ordered DNA testing to determine that the victim's blood, rather than appellant's blood, was on a knife and on appellant's clothing. Samples were sent to Cellmark Diagnostics in Maryland where Paula Yates performed the DNA testing. The state called Ms. Yates at trial to testify that appellant's blood could be excluded as the blood on the knife and clothes and the victim's blood could not be excluded. (Tr. 848). She then noted the frequency with which a match could be found in the general Caucasian population. (Tr. 851).
Prior to giving this testimony, the state asked her questions about her background and her work experience. From these questions, it was disclosed that Ms. Yates received a Bachelor of Science in Zoology from the University of Maryland in 1988. She took courses in genetics and DNA. She began working at Cellmark in October 1988, over eleven years prior to the trial. During that time, she performed work in various types of cases, specifically approximately 1000 criminal cases. (Tr. 839). She is currently the forensic supervisor with responsibility for the work of ten other analysts who do DNA testing. Her job duties currently entail testing, assigning testing duties to others, helping others process material, and reviewing the work of others below her. She has been qualified as an expert witness before in the State of Ohio. (Tr. 840).
Appellant now complains that this testimony was insufficient to qualify Ms. Yates as an expert who can testify on DNA matching and the statistics about the frequency of occurrence. He claims that the state was required to call a molecular biologist to testify about DNA matching and a population geneticist to testify about statistics and frequency. In support, he cites two cases from the First Appellate District. In Statev. Lane (1995), 108 Ohio App.3d 477, 482, the court noted that the state qualified a Cellmark employee as a population geneticist but not as a molecular biologist. In State v. Austin (1998), 131 Ohio App.3d 329,338, the court distinguished their Lane case and found that the state qualified the Cellmark employee as an expert in both categories because he had a Ph.D in microbiology, took courses in population genetics, and trained under a population geneticist (the one who testified in Lane).
The state counters by explaining that the first district only criticized the witness selection because the population geneticist was not the individual who conducted the DNA test. See Lane,108 Ohio App.3d at 482. See, also, Austin, 131 Ohio App.3d at 339. Cf. State v. Thomas
(1991), 63 Ohio App.3d 501, 503 (where the tenth district held that this same population geneticist was qualified to testify on DNA test results). The state also notes that the first district ultimately found that Lane failed to object to the expert's qualifications and thus waived all but plain error. See Id. (noting that a report was presented on the match, finding that the DNA evidence was not tainted by explanation of molecular biology by a population geneticist, and thus, finding no plain error). Finally, the state then points out that appellant failed to object to the qualifications of Ms. Yates. The state explains that if it knew appellant had a problem with the cursory voir dire of the expert's qualifications, it would have asked more in depth questions. The state urges that we find no plain error.
Evid.R. 702, which controls admission of expert testimony, reads:
"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."
Hence, the test of admissibility is merely whether a particular witness will aid the trier of fact in the search of truth, not whether the expert is the best witness on the subject. Ishler v. Miller (1978),56 Ohio St.2d 447, 453. The determination of whether an expert is qualified rests within the sound discretion of the trial court based on the facts presented and will not be reversed absent a clear showing of an abuse of discretion. State v. Maupin (1975), 42 Ohio St.2d 473, 479.
In utilizing this test, the second district disagreed with the defendant's argument that a Ph.D. should have been called rather than the forensic supervisor from Cellmark who tested the defendant's blood. Statev. Blair (1990), 70 Ohio App.3d 774, 789-790. That supervisor had a Bachelor of Science in Medical Technology and worked at Cellmark for only one year during which time he performed approximately forty forensic cases and 1,000 paternity cases. "The mere fact that Cellmark had employees who might have been more qualified does not mean that [the witness] was unqualified." Id. at 790.
Furthermore, the eighth district upheld an expert's qualification to testify on DNA matching and frequency of occurrence. State v. Wages
(1993), 87 Ohio App.3d 780. This expert who performed the DNA test had a Bachelor of Science in Forensic Serology, had experience in testing blood and collecting frequencies, and trained other forensic scientists.
As aforementioned, the best expert need not be called but merely one who has superior knowledge not possessed by the ordinary juror. Id. at 787. See, also, Ishler, 56 Ohio St.2d at 453. Note the "or" between training and education in Evid.R. 702. In accordance, to be an expert one need not have acquired the scientific, technical, or other specialized knowledge through a specific medium. Hence, in reviewing Ms. Yates' qualifications and her testimony explaining DNA matching and frequencies, it does not appear that the court unreasonably allowed the testimony.
Regardless, appellant failed to object, and plain error is not apparent. Even if Ms. Yates was not qualified to testify as to population genetics, the testimony that it could have been the victim's blood (the frequency testimony) was not more incriminating than the DNA matching testimony that it could not have been his blood on the knife and shirt. Moreover, the identity of the blood in the case at bar is not the type of incriminating evidence that often makes or breaks a case. Here, there was no alibi or mistaken identity defense. His children watched him do it. He admitted the stabbing to the sheriff and in opening statements and closing arguments. As such, this assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER TWO
Appellant's second assignment of error provides:
 "THE RESULTS OF THE DNA ANALYSIS WERE INADMISSIBLE AT TRIAL DUE TO THERE BEING NO FOUNDATIONAL REQUIREMENTS AT TRIAL TO SHOW THAT THE BLOOD ANALYZED WAS THAT OF JAMES AND MARGARET JONES."
Appellant claims that the state failed to present any chain of custody evidence regarding the blood samples that were tested. However, from a review of the transcripts the state did present some chain of custody evidence. The lead investigator from the Mingo Junction Police Department testified that the victim's blood was drawn at the autopsy. The coroner confirmed that he drew blood. (Tr. 836).
Appellant's son testified that appellant was all bloody when he fled from the house. (Tr. 652). An officer testified that appellant's shirt was covered in blood when he was found laying on the ground near the house. The lead investigator testified that defendant's bloody shirt was cut off by emergency medical personnel near the crime scene, submitted to BCII, and later forwarded to Cellmark. He also stated that he found the tested knife at the crime scene and submitted it to BCII who later forwarded it to Cellmark at his request. He identified the blood sample exhibits and testified that all evidence that he testified about is in substantially the same condition as when he sent it out for testing. (Tr. 806-814). The testimony of Ms. Yates provided chain of custody evidence from the time the samples arrived at Cellmark. (Tr. 841-844). She also identified the blood sample exhibits.
Appellant should note that the admission and exclusion of evidence is within the broad discretion of the trial court and will not be reversed absent an abuse of discretion and material prejudice. Evid.R. 901(A) states that evidence is authenticated or identified sufficient for admission if there is evidence to support a finding that the matter in question is what the proponent claims it is. Direct testimony or inference can establish a chain of custody. See State v. Vermillion (June 24, 1999), Belmont App. No. 98BA16. The possibility of contamination during a break in the chain goes toward weight rather than admissibility. State v. Richey (1992), 64 Ohio St.3d 353, 360 (where chemical contamination was possible because the incriminating rug taken from a torched residence was accidentally taken to a trash dump and later retrieved). "A strict chain of custody is not always required in order for physical evidence to be admissible." Id. The state need not prove a perfect, unbroken chain. State v. Keene (1998), 81 Ohio St.3d 646, 662. See, also State v. High (Jan. 1, 2001), Mahoning App. No. 98CA119 (Vukovich, P.J. dissented on other grounds).
In any event, appellant did not object at the trial level. He thus waived all but plain error. Even if he had objected, there is no prejudice under the analysis of the prior assignment of error, which points to the overwhelming, uncontested evidence that appellant stabbed his wife.
 ASSIGNMENT OF ERROR NUMBER THREE
Appellant's third assignment of error contends:
 "THE ADMISSION OF THE TESTIMONY OF MEETA BASS-LYONS WAS PREJUDICIAL AND VIOLATED THE DEFENDANT'S RIGHTS TO A FAIR TRIAL UNDER THE FOURTEENTH AMENDMENT OF THE FEDERAL CONSTITUTION AND ARTICLE I SECTION 16 OF THE OHIO CONSTITUTION."
"The Admission of Statements by Mr. Jones at the Hearing was Hearsay."
When the domestic relations court issued the temporary protection order, it assigned the case to a magistrate, Meeta Bass-Lyons. She scheduled the initial hearing for April 8, 1999. She is the author of the April 9 judgment entry which continued the hearing to April 30. She conducted the April 30 hearing, and she recommended the permanent order which was accepted by the domestic relations court.
A pretrial hearing was held in the criminal case to determine the validity of the protection order. The magistrate testified at this pretrial hearing about the proceedings that occurred before her, her intent in issuing the April 9 judgment entry, and her understanding of the law. She was also called by the state at the full jury trial. Appellant now criticizes the use of her testimony on three grounds.
First, appellant seems to argue that Magistrate Lyons was not the magistrate who conducted the April 8 hearing and thus could not testify to what appellant said at that hearing. It appears that appellant is confused. There was no April 8 hearing. It was rescheduled before it started. Any testimony mentioning that a hearing was held before a judge was in reference to the April 1 ex parte hearing that was held on the petition for a temporary restraining order. There is no testimony about statements appellant made at the April 1 hearing as he was not there.
The magistrate did mention that appellant stopped by the court on April 7 to ask for counsel. (Tr. 692). No objection was made to this testimony. Additionally, this is appellant's own statement. See Evid.R.801(D)(2)(a); Champion v. Dunns Tire Auto, Inc. (June 26, 2001), Mahoning App. No. 00CA42 (an admission by a party opponent is a statement and need not be a statement against interest). The statement appears to have been made to the magistrate herself. Regardless, plain error is not existent as there is nothing prejudicial or outcome-determinative about this revelation. See State v. Tibbetts
(2001), 92 Ohio St.3d 146, 157 (stating that where there is no objection to alleged hearsay, the court is limited to a plain error review).
Next, appellant complains that the magistrate testified that St. John's Mental Health contacted the court on behalf of appellant just prior to the April 8 hearing to request a continuance because he was being admitted. (Tr. 692). This was not a statement of appellant himself. Yet, there was no contention that appellant did not ask the hospital to seek the continuance on his behalf. See Evid.R. 801(D)(2)(a) and (c) (including a statement by a person authorized by him to make a statement). In any event, it was merely set forth to show why she continued the hearing. No objection was offered, and no prejudice is apparent.
Finally, appellant takes issue with the magistrate's testimony which gave her opinion that the law provides a five year default expiration date where no date certain is specified and thus concluding that her April 9 judgment entry continued the temporary order for such a period. (Tr. 711). Appellant states that this testimony prejudiced him because it bolstered the meaning of the protection order and usurped the court's function on determining the law.
The reason the magistrate was called as a state witness was to identify the joint exhibits, such as the temporary restraining order and the continuance, and place them within a context for the jury. This is not only acceptable, but encouraged. See State v. Allen (Dec. 13, 1999), Lucas App. No. L-98-138. The portion of testimony contested and quoted in appellant's brief was elicited by appellant on cross-examination of the magistrate. The state specifically argued that the legal issues had already been resolved at the pretrial hearing, but the defense desired to delve into the magistrate's understanding of the orders and their expiration dates.
Although prior questioning on direct examination mentioned the expiration dates, an opinion on the law was not actually set forth. We agree that a legal opinion is not the province of a witness but is the function of the court. See, e.g., Sikorski v. Link Elect. SafetyControl Co. (1997), 117 Ohio App.3d 822, 831; State v. Walsh (1979),66 Ohio App.2d 85, 100. Here, the court had already rendered its legal opinion and again rendered its legal opinion in jury instructions, an opinion which coincided with that of the witness. As such, even if there were error, the error would be harmless.
 ASSIGNMENT OF ERROR NUMBER FOUR
Appellant's fourth assignment of error contends:
 "THE TRIAL COURT ERRED TO THE PREJUDICE OF THE DEFENDANT WHEN IT DID NOT SUBMIT TO THE JURY THE LESSER INCLUDED OFFENSE OF INVOLUNTARY MANSLAUGHTER."
Although the text of this assignment refers to involuntary manslaughter, appellant thereafter discusses voluntary manslaughter and cites case law thereon. As such, we should proceed on a voluntary manslaughter analysis. Appellant requested a lesser included offense/inferior degree instruction dealing with the elements of murder and voluntary manslaughter. (Tr. 894-899). The court agreed to instruct on murder but refused to instruct on voluntary manslaughter. Contrary to the state's contention, appellant was not required to object during the reading of the jury charge in order to preserve his prior request for the voluntary manslaughter instruction. State v. Wolons (1989),44 Ohio St.3d 64, 67. Therefore, appellant properly preserved the issue for our review.
Voluntary manslaughter is an inferior degree of murder. State v.Rhodes (1992), 63 Ohio St.3d 613, 616. Where a defendant is tried on murder, he can attempt to mitigate the charge to voluntary manslaughter, in which case the state must prove beyond a reasonable doubt that the defendant knowingly caused the victim's death and the defendant must prove by the preponderance of the evidence the existence of a statutorily defined mitigating circumstance. Id. These mitigating circumstances require that the killing be "while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force." R.C. 2903.03.
The Supreme Court has outlined four determinations for reduction of murder to manslaughter: (1) reasonable provocation; (2) the defendant was in fact provoked; (3) a reasonable person would not have cooled off in the interval of time between the provocation and the delivery of the fatal blow; (4) the defendant did not in fact cool off. State v. Shane
(1992), 63 Ohio St.3d 630, 639, fn. 1. Notice that the first and third factors are objective, while the second and fourth are subjective. An inferior degree instruction on voluntary manslaughter is required where sufficient evidence is presented which would a allow a reasonable juror to reject the greater offense and find the defendant guilty of voluntary manslaughter. Id. at 632-633 (noting that "some evidence" is insufficient).
In Shane, the victim came home drunk and went to sleep. The defendant woke her up to inquire about her fidelity to him. After initially denying her infidelity, the victim admitted that she had been sleeping with other men and no longer cared for the defendant. The defendant then strangled the victim. The Supreme Court stated that as a matter of law, the defendant was not entitled to a voluntary manslaughter instruction. Id. at 631. The Court stated that the provocation was not reasonably sufficient to invoke the passions or rage of an ordinary person, noting that "words alone will not constitute reasonably sufficient provocation to incite the use of deadly force in most situations." Id. at 637 (explaining that archaic rules about verbal disclosures of spousal infidelity have no place in modern society as they are based on ancient common law theories that the wife is the property of the husband). The Court noted that the defendant built the anger up in his own mind and manufactured much of the anger by forcing the victim to admit her infidelity. Id. at 638.
In State v. Thompson (Nov. 18, 1999), Jefferson App. No. 97JE40, we stated that the defendant was not entitled to a voluntary manslaughter instruction. In that case, the defendant woke up after passing out in his girlfriend's car in the parking lot of her apartment. She was not in her apartment when he entered but had gone out with two male friends. When she returned, the defendant repeatedly punched, kicked, kneed, pushed, and threw her around the parking lot and apartment, eventually causing her death. We held that any provocation was insufficient to incite a reasonable person and that a reasonable person would have cooled off before engaging in such conduct. Id. at 4.
In the present case, near the day of the killing, appellant's daughter apparently asked appellant's mother for lunch money; he thus contends that he was mad that the victim was not taking care of the children's needs but had time to spend with a new boyfriend. Appellant claims that he was also provoked by the fact that he had been told the day before the killing that his wife was going to move in with a black man. He notes that he was drinking and crying in the hours before the killing.
We uphold the trial court's determination that an inferior degree instruction on voluntary manslaughter was unwarranted. Although words cannot constitute reasonable provocation in most cases, here, there is no testimony that the victim stated anything to appellant. Moreover, the couple separated months before the murder. Appellant had a suspicion of infidelity prior to that and beat her because of it. The victim sought a protection order from appellant two months before the murder. Three days before the killing, appellant told his friend, "If I found out she's seeing a black man I will kill her. I won't have no nigger raising my children." The fact that appellant is a racist is not part of reasonable provocation. (Tr. 750). Appellant also told his neighbor a couple hours before the killing, that he was going to kill his wife. (Tr. 761). He later took a knife from his parents' house and forced his way into the victim's dwelling; he then chased her around stabbing and slashing her multiple times at various places in the house.
For the foregoing reasons, there did not exist a serious provocation occasioned by the victim that would cause a reasonable person to inflict deadly force. Besides a lack of reasonable provocation, we also have a time within which a reasonable person would have cooled off. This assignment of error is without merit.
 ASSIGNMENT OF ERROR NUMBER FIVE
Appellant's fifth assignment of error, which is divided into three subassignments, contends:
 "THE BURGLARY CHARGE WAS NOT PROVEN SINCE THERE WAS INSUFFICIENT EVIDENCE TO SHOW A VIOLATION OF THE CIVIL PROTECTION ORDER."
Prior to analyzing the subassignments, some procedural background of the case should be reviewed. In a pretrial motion, appellant sought dismissal of the civil protection order charge, the aggravated burglary charge, and the death specifications on the grounds that: he did not violate a protection order; thus, he was not precluded from entering his own house; thus, he did not trespass; and thus, he did not commit burglary. The state argued that the temporary protection order was valid at the time of the murder. The state also argued that its burglary allegations did not revolve around the protection order but revolved around spousal burglary law, which basically states that Spouse A can trespass into the jointly-owned marital residence if Spouse A moved from the residence and the residence became the dwelling of Spouse B. After a pretrial hearing, the trial court ruled that the protection order was valid. Although the trial court opined that the state's alternative arguments on spousal burglary were unconvincing, the court ultimately found these arguments to be moot due to the validity of the protection order which erased appellant's privilege to approach the marital residence.
Appellant's second subassignment shall be addressed first as the state believes that its response to this subassignment makes the other two subassignments moot. This subassignment alleges:
 "The State Did Not Prove That the Defendant was Guilty of Aggravated Burglary."
Appellant argues that if the protection order is invalid, then the state failed to present sufficient evidence of burglary. The elements of the aggravated burglary for which appellant was convicted are as follows: (1) trespassing (2) by force, stealth or deception (3) in an occupied structure when another is present (4) with purpose to commit any criminal offense and (5) (a) the offender inflicts or attempts or threatens to inflict physical harm or (b) he has a deadly weapon on or about his person or under his control. R.C. 2911.11(A)(1) and (2). The element with which appellant takes issue is trespass. Trespass occurs when a person, without privilege to do so, knowingly enters or remains on land or premises of another. R.C. 2911.21(A)(1). The land or premises includes a structure belonging to, controlled by, or in custody of another. R.C. 2911.21(E).
Although he states that the contested element is trespass, some of appellant's arguments seem to imply a lack of forced entry. As the state responds, evidence could reasonably be interpreted as demonstrating that he forced his way into the house; this includes the bent key in the door and the refrigerator which was partially blocking the entrance. Appellant believes it is significant that his son never testified that the victim tried to push the refrigerator against the door. However, this does not mean it did not happen. Appellant also fails to recognize that his son testified that the victim was attempting to use the phone when appellant angrily entered and slammed the phone down. Dispatch from 911 confirmed a hang up call at this time. Moreover, appellant entered with a knife from his mother's kitchen. It should be remembered that the entry can also be by stealth or deception. As is well-established, a person can be a burglar even if he enters through a wide open door. Hence, appellant's use of a key is not dispositive.
At any rate, we should return to the framed issue of trespass. Appellant states that he has privilege to enter the marital residence, which was jointly owned. The state responds to appellant's argument by setting forth law on what shall be called spousal burglary and stating that appellant committed burglary even if a valid protection order did not exist.
We shall now set forth the law on spousal burglary and an analysis for extending this law to a case such as the one before us. The following two cases set the stage: State v. O'Neal (2000), 87 Ohio St.3d 402; State v.Lilly (1999), 87 Ohio St.3d 97. In Lilly, the estranged wife leased an apartment and the husband occasionally stayed there but never lived there and did not have a key. On exiting the apartment with his wife, he left the door unlocked without her knowledge and returned later to steal her purse and damage her property. In defending his burglary charges, the husband argued that a civil statute gives spouses rights in the property of each other during marriage and thus he could not have trespassed in the apartment. The court stated that civil privileges of a husband and wife do not provide a criminal defense where the elements of burglary are otherwise presented. Lilly, 87 Ohio St.3d at 102.
The Court then reviewed a case where an estranged husband killed his wife after breaking into the home she leased in her name only. The husband had previously lived there as it was the marital residence, but he moved out after an argument just days before the murder. A protection order was in the process of being issued but had not yet been issued; it was conceded that if the order had been issued, then the defendant would have no privilege to enter. The Court held there existed sufficient evidence of burglary based on the Lilly holding, stating that the house was in the wife's sole custody and control at the time of her murder.O'Neal, 87 Ohio St.3d at 407-408.
One may argue that Lilly and O'Neal are distinguishable from our case due to the fact that those wives leased the premises in their names only, but here, appellant and the victim both had their names on the deed. However, the Supreme Court pronounced the following broad holding:
"Because the purpose of the burglary law is to protect the dweller, we hold that custody and control, rather than legal title, is dispositive. * * * Thus, in Ohio, one can commit trespass and burglary against property of which one is the legal owner if another has control or custody of that property." Lilly, 87 Ohio St.3d at 102 (noting that if one believes he is being unlawfully excluded, he possesses peaceful civil avenues).
The holding had more to do with who was currently dwelling in the home and little to do with whose name was on the title or lease. See O'Neal,87 Ohio St.3d at 408. In fact, the Court specifically cited and agreed with cases from other jurisdictions that have addressed the case of a spouse entering the jointly owned marital residence after moving out and into a new abode. Id. at 103, citing, e.g., People v. Hollenbeck
(Colo.App. 1996), 944 P.2d 537; White v. State (Ala.Crim.App. 1990),587 So.2d 1218; Matthews v. Commonwealth (Ky. 1985), 709 S.W.2d 414;State v. Schneider (Wash.App. 1983), 673 P.2d 200.
In Hollenbeck, the court held that the question in a spousal burglary of a home where both once lived is occupancy, not ownership. Hollenbeck,944 P.2d at 539. In White, the wife filed for divorce, the husband vacated and took his belongings, and the wife then changed the locks. The husband entered and killed the wife. The appellate court upheld his death sentence and the jury instruction, stating that a spouse can commit burglary of his own residence if he moved out. White,587 So.2d at 1224-1225. The court noted that burglary is an offense against a possessory interest and deals with occupancy at the time of the offense. Id. at 1223, adopting State v. Herrin (1982), 6 Ohio App.3d 68 (Ninth Appellate District).
The Twelfth Appellate District has also applied spousal burglary to scenarios where a spouse who moved out enters the jointly owned marital residence. State v. Crouse (Dec. 6, 1999), Fayette App. No. CA98-10-016. We should also note a law review article written in response to the case that we have before us. Jane M. Keenan, The End of an Era: A Review ofthe Changing Law of Spousal Burglary, 39 Duq. L. Rev. 567 (2001) (prefacing the article with the facts of the Jones murder). This commentator advises the legislature to codify the spousal burglary case law to ensure that defendants do not make arguments like those made by appellant in the case at bar. Id. at 617-618, fn. 296 (specifically quoting from the pretrial hearing in this case).
For the above reasons, this court finds that the holdings in Lilly andO'Neal are necessarily applicable to the facts of this case, and thus, the spouse who moves from the jointly owned marital residence can commit trespass by entering that residence if uninvited at the time of entrance.
A rational trier of fact could find that the victim had custody and control of the residence due to the testimony that appellant moved out of the marital residence and moved into his parents' home for the time being, leaving the victim to reside in the marital residence. Appellant himself gave his parents' address as his address in official documents at various times throughout the months of April, May, and June. Even if the protection order was not valid, appellant thought it was and told multiple people that he could not approach his residence where his wife was dwelling, thus acknowledging that he had no right to enter. As such, viewing the evidence in the light most favorable to the state, a reasonable jury could find that: his possessory interest had been relinquished; the victim had sole custody on the day of the murder and for the two months prior to that; appellant thus trespassed into the residence; and, thus, there existed sufficient evidence of burglary. SeeState v. Goff (1998), 82 Ohio St.3d 123, 138.
However, as aforementioned, the state started out with two separate and distinct theories supporting the charge of burglary: the spousal burglary law and the existence of a protection order. If the protection order was valid, then any privilege to enter the residence was erased and trespass could be easily established. See State v. O'Neal (1995),103 Ohio App.3d 151, 155 (noting if there exists a restraining order or other court order granting one party exclusive possession of the marital residence, then the issues are simple), aff'd., 87 Ohio St.3d 402. If the protection order was invalidated by the trial court, the state wanted to rely on spousal burglary law and present factual questions to the jury on whether appellant moved out, giving the victim custody or control of the marital residence and resulting in a trespass on the day of the murder.
Yet, in response to appellant's pretrial motion to dismiss, the trial court decided that these spousal burglary issues were moot based on its finding that the protection order was valid. Therefore, the court did not specifically instruct the jury on the control or custody law. Instead, they were charged that the protection order was still valid on the day of the murder. (Tr. 943). As for trespass, they were instructed about an unlawful entrance without authority, consent, or privilege. (Tr. 940). This leads into the question of the validity of the protection order, which shall be addressed in response to appellant's next two subassignments.
Appellant's first subassignment of error contends:
 "The Application of Revised Code 3113.31 in the Case Violates Due Process Under the Fourteenth Amendment and Article I Section 16 of the Ohio Constitution."
Appellant initially argues that some evidence established that he was at the marital residence with the victim's consent after the temporary restraining order was issued on April 1, 1999. He claims that it is a due process violation to convict him of burglary when she waived the protection order by letting him in on prior occasions. The state responds by pointing out testimony establishing that some of these visits were made without the victim's consent. For instance, the state notes that on April 24, she called the police reporting that he had a knife. There is also an allegation that he raped her in May. (Tr. 679-686). The Memorial Day encounter that he mentions occurred away from the marital residence when she was dropping the children off at her cousin's. (Tr. 662-663). When pressed if appellant was at the residence in May, a witness answered affirmatively but added, "she was trying to keep him away * * *." (Tr. 672).
Regardless, the civil protection order statute provides that where the order requires the respondent to vacate or refrain from entering the residence, the order shall clearly state that the order cannot be waived or nullified by invitation to the respondent to enter. R.C.3113.31(E)(7)(a). The order at issue specifically directed appellant to vacate the residence, hand over all keys, stay away from the petitioner, and refrain from possessing a deadly weapon. In accordance with the statute, the order specifically advised appellant that it could not be waived.
Appellant responds by noting that R.C. 3113.31(E)(7)(b) provides that regardless of the petitioner's inability to waive the order, the court still has discretion to determine that a respondent did not commit a violation of a protection order offense. Hence, he concludes that when the petitioner invites the respondent in, the respondent has a defense to a charge of violating a protection order. It may be true that a court can use its discretion to dismiss a violation of R.C. 2919.27 where the victim invited the defendant to approach her; however, two items stand in the way of appellant's argument. One, the defense is not absolute but is within the discretion of the court. A respondent cannot totally rely on consent to make his entry authorized for purposes of the protection order statute itself.
More importantly, this discretionary defense deals with consent to enter on the date of the violation. Regardless of some past consensual encounters, the state's theory was that she did not consent to his entry at the time of the killing. As aforementioned, the state presented evidence that appellant's key was found bent in the door, the refrigerator was found partially blocking the entrance of the door through which appellant was seen entering, and a hang up call was made to 911 just as appellant entered and tore the phone from the victim's grasp. In accordance, this subassignment is overruled.
Appellant's third subassignment of error provides:
 "The Civil Protection Order Was Not Valid Due to it Not Being Mailed Out the Day it Was Issued."
A review of the protection order proceedings is helpful. The victim filed for a protection order on April 1, 1999. The court issued an ex parte temporary protection order that same day. The order stated that it is effective through April 30, 1999. The court referred the matter to a magistrate. A full hearing was set for April 8, 1999. This hearing date was scheduled within the time required by R.C. 3113.31(D)(2)(a). However, appellant asked for a continuance as he was hospitalized for attempting suicide. The continuance was permissible as per R.C.3113.31(D)(2)(a)(iv). See, also, R.C. 3113.31(D)(2)(b) (which provides that an ex parte order does not expire "because of a failure to serve notice of the full hearing upon the respondent before the date set for the full hearing" or "because the court grants a continuance" of the full hearing under R.C. 3113.31(D)(2)(a); note that appellate counsel agrees with the state's interpretation of this provision under this and the ninth assignment of error).
A judgment entry was sent to the parties on April 9, 1999 which reset the hearing for April 30, 1999 and stated, "The ex parte order filed by this Court on April 1, 1999 shall remain in full force and effect." On April 30, 1999, the parties appeared for the full hearing. The magistrate heard testimony and specifically advised appellant on the record that the ex parte protective order remains in effect until the decision on the full hearing is issued. The magistrate then ordered Children Services to conduct an investigation concerning income for purposes of temporary child support.
On Friday May 28, 1999, the court issued the full hearing civil protection order which was valid for one year. Unlike the temporary order, this permanent order did not instruct the clerk to cause law enforcement officers to personally serve appellant on the date of filing. Due to the holiday weekend, the decision was not mailed out until Tuesday June 1, 1999, the day of the murder.
Under this subassignment, appellant's brief contains a mere four sentences. First, he states that testimony established that the protection order was not delivered or mailed to him on the day it was issued. He then cites R.C. 3113.31(F)(1), which provides that the "court shall direct that a copy of an order be delivered to the respondent on the same day that the order is entered." Finally, he concludes that the order was not valid because it was not mailed on the day it was issued.
First, we should note that delivery on the date of issuance is a procedural mechanism meant to protect victim/petitioners and give notice to respondents as early as possible. The mere fact that a protection order is not delivered to the respondent on the date of issuance does not invalidate the order but rather would provide a defense if an alleged violation of the order took place before the respondent received notice of the order. In this case, the state does not allege that appellant received the permanent order which had not been mailed out until the day of the murder. Rather, even if a respondent does not yet have notice of a permanent order because it was not delivered on the date of issuance, during the time between issuance and notice, the respondent can still violate any temporary protection order in existence. The fact that he had not yet received the permanent order is not relevant as the crime of violating a protection order applies to temporary and permanent orders. R.C. 2919.27(A)(1), citing R.C. 3113.31. As such, this subassignment is overruled.
 ASSIGNMENT OF ERROR NUMBER SIX
Appellant's sixth assignment of error provides:
 "THE APPELLANT WAS DENIED HIS RIGHT TO A FAIR TRIAL AS A RESULT OF PROSECUTORIAL MISCONDUCT."
Appellant alleges four instances of prosecutorial misconduct in closing arguments. The test for determining prosecutorial misconduct in a closing argument entails an evaluation of the propriety of the remarks and whether any improper remarks prejudicially affected the defendant's substantial rights. State v. Twyford (2002), 94 Ohio St.3d 340, 354. A closing argument must be viewed in its entirety to determine whether certain remarks are prejudicial. State v. Loza (1994), 71 Ohio St.3d 61,78. Comments should not be evaluated in isolation. Twyford,94 Ohio St.3d at 355.
Because he failed to object below, appellant argues that the contested statements represent plain error. See Id. (explaining that where there is no objection to the closing argument, all but plain error is waived). First, he complains about two pieces of information within the prosecutor's version of his eight-year-old son's testimony. In reviewing the testimony, the prosecutor mentioned that the key broke off in the door and that the victim tried to block the door with the refrigerator. (Tr. 921). Appellant notes that his son did not testify to this.
We should note that one witness who was identifying the key exhibit testified that the remainder of the key is still in the lock, implying that it broke at one point, probably when officials tried to remove it. (Tr. 806). This may be why the prosecutor said broken instead of bent. However, this misstatement is not prejudicial. The child testified that appellant entered with his key. The child stated that the key was bent in the lock due to appellant's anger. (Tr. 650). Other witnesses testified that the bent key was found hanging from the lock. (Tr. 791, 806, 863). Furthermore, the jury watched a video of the crime scene depicting the bent key hanging from the lock. (Tr.817). Hence, the misstatement could clearly be seen for what it was by the jury.
As for the moved refrigerator, appellant correctly states that the child did not testify that he saw the victim move the refrigerator. (The subject of the refrigerator did come up in the child's testimony on cross-examination, however, where Brandon impaired the defense's theory that the refrigerator must be moved in order to use the dishwasher.) However, the prosecutor's statement is not totally without support or prejudicial. The sheriff testified that soon after the killing, the kids told him that the victim moved it. (Tr. 862-863). Appellant states that this does not count because it was inadmissible hearsay; yet, this issue is discussed in the state's favor under the next assignment of error. Other witnesses testified that they discovered the refrigerator partially blocking the door. (Tr. 608-609, 792). Additionally, the jury watched the crime scene video showing the position of the refrigerator. (Tr. 817).
Appellant next complains that the prosecutor stated that appellant's suggestion that he did not know about the restraining order was a "smoke screen." (Tr. 922). The state notes that in State v. Williams (Mar. 7, 1996), Cuyahoga App. No. 68609, the eighth district refused to find prosecutorial misconduct in closing arguments that described evidence as a "smoke screen" to "throw you off." Appellant notes that in State v.Hill (Feb. 12, 1999), Hamilton App. No. C-97109, the first district found that a closing argument improperly denigrated defense counsel where the prosecution used words such as "put smoke up in the air" and "create smoke." However, the Hill court then held that the defendant failed to object and the comments did not prejudicially affect the defendant's substantial rights. Id. at 4.
In State v. Smith (1984), 14 Ohio St.3d 13, 14, the Court stated that prosecutorial misconduct occurred where the state not only described the defense as a smoke screen but repeatedly described the defense as "lies," "garbage," "garbage lies," and "well-rehearsed lie." Finally, in Statev. Bey (1999), 85 Ohio St.3d 487, the Court reviewed a prosecutor's closing which accused the defense of confusing the issues to create doubt. The Court stated that although defense counsel may arguably have been denigrated, the statements were not prejudicial. Id. at 494. In the context of these cases and the entire closing argument in the case before us, appellant's defense was not prejudiced by the use of the phrase "smoke screen."
Lastly, appellant complains that the prosecutor described the victim as "battered, she fits the syndrome." (Tr. 923). Appellant contends that this statement is clearly beyond the evidence presented. As for the prosecutor describing the victim as battered, this is an opinion which he may draw based on the evidence and reasonable inferences which could be drawn from that evidence. See Id. at 495 (stating that the prosecutor has latitude in closing arguments as to what can be inferred from the evidence presented). See, also, State v. Nields (2001), 93 Ohio St.3d 36,38. Testimony was presented that appellant beat the victim in January 1999. She entered a shelter for this reason. She received a protection order based on domestic violence. She called police in April because he violated the restraining order and seemed to have armed himself with a knife. She may have been raped by him thereafter. As for reference to a syndrome, this was not specifically supported by the evidence. However, plain error is not apparent in the context of the entire closing argument. Not all improper remarks made in closing require reversal.State v. Maurer (1984), 15 Ohio St.3d 239, 267 (noting that attorneys occupy adversarial positions and may understandably get caught up in the heat of the moment). For the foregoing reasons, this assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER SEVEN
Appellant's seventh assignment of error contends:
 "THE TRIAL COURT SHOULD HAVE HAD A HEARING TO DETERMINE THE ADMISSIBILITY OF THE HEARSAY STATEMENTS OF THE JONES CHILDREN."
After the children testified, the Jefferson County Sheriff testified as to what the children told him when he arrived on the scene. The first 911 call took place at 10:17 p.m., contemporaneous with the stabbing. The police arrived shortly thereafter. The sheriff arrived at approximately 10:45 p.m., did a three minute walk through of the house, and immediately proceeded to the neighbor's house where the children were being safeguarded. (Tr. 857). Before allowing the sheriff to testify on the children's statements, the court required a foundation be presented for the excited utterance hearsay exception. The sheriff then testified that eight-year-old Brandon was very upset and was crying. Ten-year-old Stephine was also crying. He said that both children still had blood on their hair, fingernails, hands, and other parts of their body. (Tr. 859-860). He described each child as a "basket case." (Tr. 861). The sheriff then related the statements made to him by the children at the neighbor's house and then back at the crime scene where the sheriff returned them to have Brandon show him where he was when appellant entered. (Tr. 861).
On appeal, appellant argues that the court should have had a separate hearing to determine the admissibility of the statements. He then contends that the statements should have been excluded as they were made too long after the killing.
Pursuant to Evid.R. 803(2), even if a declarant is available to testify, a statement is not excluded by the hearsay rule if the court determines that it is an excited utterance. To qualify as an excited utterance, the statement must relate to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition. At issue here is not whether the event (witnessing their father repeatedly stab their mother as they tried to pull him off) was sufficiently startling. The issue is whether the children made their statements to the sheriff while still under the stress of excitement caused by the killing.
An excited utterance need not be contemporaneous with the event, as long as it is made before the elapsed time for the nervous excitement to lose domination over the declarant's reflective faculties. State v.Taylor (1993), 66 Ohio St.3d 295, 300-301. The passage of time is relevant but not dispositive. Id. at 303. Each case is to be decided based upon its own set of circumstances. Id. As such, the trial court's decision is not disturbed by the appellate court absent an abuse of discretion. Id. at 304-305 (noting that a reasonable decision on sustained excitement should be affirmed even if the appellate court would have excluded the hearsay).
In State v. Huertas (1990), 51 Ohio St.3d 22, 31, the Supreme Court found that the adult victim's statements were admissible where they were made at the hospital thirty to forty-five minutes after he was stabbed where the evidence demonstrated that he was very agitated, in serious pain, and had not calmed down. The Supreme Court has also noted that they have admitted statements of children in sexual abuse cases that were made after a substantial lapse of time. Taylor, 66 Ohio St.3d at 304. "[C]hildren are likely to remain in a state of nervous excitement longer than would an adult." Id. at 304, citing State v. Boston (1989),46 Ohio St.3d 108, 117-118 (also recognizing a child's limited reflective powers).
The circumstances of the event in this case should now be considered. Two children, ages eight and ten, saw their father stab and slash their mother approximately thirty times, tried to pull their father off of their mother, heard their mother screaming for her life, saw their father throw their mother down the basement stairs, saw their mother's body lying at a discarded angle with blood pouring from her wounds. Stephine tried to turn her mother over to give her CPR but was not strong enough. The first officer on the scene entered with his gun drawn. More police arrived and began searching the house and scouring the neighborhood for their father. Approximately thirty minutes later, the sheriff approached the children who were still crying and very upset. They knew their mother was dead. The sheriff described them as basket cases and stated that they were still covered in their mother's blood. The trial court did not abuse its discretion in determining that the children were still under the stress of the event and had not yet utilized reflective processes which could taint their statements. Under this analysis, we affirm the trial court's decision to admit the children's statements to the sheriff as excited utterances.
In regards to appellant's contention that the court should have conducted a hearing to determine admissibility outside the presence of the jury, we find no error. Under Evid.R. 104(C), a court must conduct a hearing outside the jury's presence in determining the admissibility of a confession and on other preliminary matters "when the interests of justice require." An example of when the interests of justice would require a hearing is when the defendant is a witness and he requests the hearing on the preliminary issues concerning his own testimony. See Staff Note. Here, nothing related by the sheriff on the children's condition of stress and excitement would have been inadmissible in itself. Moreover, because the statements were ruled admissible, the lack of a hearing outside of the jury's presence was not prejudicial. Finally, appellant did not request a hearing outside of the jury's presence.
Under this assignment, appellant also complains that the sheriff's testimony on the excited utterances contained some items that the children's own testimony did not. For instance, he said they told him that the victim moved the refrigerator and the stove to block the door, but the children did not mention this in their testimony. However, this is not an admissibility issue. Courts do not evaluate whether an excited utterance matches later statements to determine whether the initial statement is admissible under the excited utterance hearsay exception. Appellant makes other credibility arguments, complaining that the sheriff opined that the door looked as if it had been kicked, but no other witness made this opinion. These arguments have nothing to do with the substance of this assignment of error. Credibility goes towards weight, not admissibility. Therefore, this assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER EIGHT
Appellant's eighth assignment of error provides:
 "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN EXCLUDING A JUROR FOR CAUSE WITHOUT AN ADEQUATE BASIS."
The test in determining whether a prospective juror may be excluded due to his views on capital punishment is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath. State v. Madrigal (2000),87 Ohio St.3d 378, 391, citing Wainwright v. Witt (1985), 469 U.S. 412. See, also, Crim.R. 24(B). The trial court's decision to exclude a juror for cause on this basis will not be overruled if supported by substantial testimony. Id. It must be remembered that besides hearing the mere answers given by the potential juror, the trial court was able to note the juror's demeanor, voice inflection and gestures in making its determination that the juror's views would prevent or substantially impair the performance of his duties. State v. Beuke (1998),38 Ohio St.3d 29, 38.
In the case at bar, the potential juror's reasons for disfavoring the death penalty are not those typically expressed in the cases excluding jurors. Here, the juror explains that he previously was in favor of capital punishment, but he recently watched a show that made him realize that life in prison is "hell" which was "just as good at the end." (Tr. 514-515). Then, he responds to the prosecutor's question on whether he could sign the verdict by stating, "No I don't think I could." When asked again, he simply states, "No." (Tr. 515). Defense counsel then went through a litany of explanations and repeated the question. Again, the juror answered, "I don't think I could do it. I don't think I could sign it." (Tr. 518). He then states, "I don't know what I would actually do." (Tr. 519). Upon further questioning by the defense, he states, "If the facts warrant it I could probably do that, if they warrant it, yeah, sure." (Tr. 520). Later, he says, "I don't know really; it's tough." (Tr. 521).
At this point, the state challenged the potential juror for cause. As such, the court conducted its own examination. The court asked whether he could sign a death verdict if he agreed that the aggravating factors outweigh the mitigating. The potential juror responded, "Honestly I don't know. I don't know. Put me in there I'd have to decide. Right now I don't know." (Tr. 523). The court then inquired if he would sign if the facts were in front of him and they favor death. The juror answered, "If the facts were in front of me I'd sign it. I'd sign it." (Tr. 524). Faced with this change of response, the court asks if he could sign a death verdict even if three other sentencing choices are before him. The potential juror then reverts to his vacillation. (Tr. 525). Thus, the court excused the juror, and the defense objected.
Viewing the responses of the potential juror in light of the above law and the following cases, we should uphold the trial court's decision to excuse the juror for cause. In State v. Tyler (1990), 50 Ohio St.3d 24,30, the Court upheld exclusion of a juror who vacillated on the questions of whether she could impose the death penalty if the aggravating circumstances outweighed the mitigating. In Madrigal, the Court again upheld exclusion of a juror who stated that she did not know if she could vote for the death penalty, she probably could not, and she was bothered by the irrevocability of it, even though she concluded by stating that she would not automatically vote one way or the other. Id. at 391-392. The Court stated that the juror's lack of definitive answers could lead the trial court to properly excuse her for cause. Id. at 392. "The fact that the defense counsel was able to elicit somewhat contradictory viewpoints from these jurors during his examination does not, in and of itself, render the court's judgment erroneous." Beuke,38 Ohio St.3d at 38. We should also note that appellant did not receive death as did the defendants in the cases cited.
In supporting his argument, appellant also contends that exclusion of this potential juror violated his right to a fair cross-section of the community. However, jurors "are not required to reflect the composition of the community at large," and "persons opposed to the death penalty do not constitute a `distinctive group' for purposes of a cross-section claim." State v. Moore (1998), 81 Ohio St.3d 22, 26, citing Lockhart v.McCree (1986), 476 U.S. 162. Therefore, this argument fails and this assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER NINE
Appellant's ninth assignment of error provides:
 "THE APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF LEGAL COUNSEL."
In order to prevail on a claim of ineffective assistance of counsel, the defendant has the burden to establish two things: (1) that counsel's performance was deficient, and (2) that counsel's deficiency prejudiced the defense. State v. Reynolds (1998), 80 Ohio St.3d 670, 674, citingStrickland v. Washington (1984), 466 U.S. 668, 687. Counsel's performance is deficient if it falls below an objective standard of reasonableness. Id. The defendant must produce evidence that counsel acted unreasonably by substantially violating essential duties owed to the client. State v.Sallie (1998), 81 Ohio St.3d 673, 674. Because attorneys are presumed competent, reviewing courts refrain from second-guessing strategical, tactical decisions and strongly presume that counsel's performance falls within a wide range of reasonable legal assistance. State v. Carter
(1995), 72 Ohio St.3d 545, 558. Hence, to justify a finding of ineffectiveness, appellant must overcome a strong presumption that, under the circumstances, the challenged action might be considered sound trial strategy. Id.
Upon demonstrating counsel's deficient performance, the defendant then has the burden to establish prejudice to the defense as a result of counsel's deficiency. Reynolds, 80 Ohio St.3d at 674. The reviewing court looks at the totality of the evidence and decides if there exists a reasonable probability that, were it not for serious errors made, the outcome of the trial would have been different. Strickland,466 U.S. at 695-696. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. In other words, if there is a reasonable probability that the result would have been different, then the actual result was unreliable and thus fundamentally unfair. Carter,72 Ohio St.3d at 558.
First, appellant contends that trial counsel were ineffective because they did not raise "proper objections" to the permanent protection order. He chastises their focus on the temporary protection order's validity and concedes it was valid. However, the state basically conceded that the permanent order was not the basis of the violation because it had not yet been delivered to appellant. This is why trial counsel focused on the validity of the temporary order. Due to our analysis under assignment of error number five, subassignment three, neither deficient performance nor prejudice are apparent.
Next, appellant complains that counsel did not object to the expert testimony of Ms. Yates. We direct appellant to our analysis under assignment of error number one where we found that Ms. Yates was sufficiently qualified to testify and that even if she was not, the outcome of appellant's trial would not have been different.
Lastly, appellant argues that counsel was ineffective by failing to request a hearing outside the presence of the jury on whether Brandon's testimony was admissible as an excited utterance. We should direct appellant to our analysis under his seventh assignment of error, which explains that a hearing outside the presence of the jury was not required. Accordingly, this assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER TEN
Appellant's tenth assignment of error contends:
 "THE TRIAL COURT SHOULD HAVE EXCLUDED THE TESTIMONY OF BRANDON JONES DUE TO PROSECUTORIAL MISCONDUCT."
Children under ten must be voir dired to determine competency to testify. During voir dire of Brandon, who is eight, the prosecutor let it be known that he talked to Brandon last week and showed Brandon the courtroom where he would be testifying. (Tr. 641). The prosecutor then asked questions about Brandon's memory and awareness of the concept of truth. (Tr. 641-644). Brandon stated that the prosecutor did not tell him what to say. (Tr. 645).
Defense counsel then conducted some voir dire of Brandon. Counsel asked if, when they were practicing questions, the prosecutor helped him answer those questions and if the prosecutor told him how to answer. Brandon said, "Yeah" to both questions. When asked if he could have answered the questions without the prosecutor's help, Brandon responded in the negative. (Tr. 646). The prosecutor then clarified Brandon's responses by asking him if the answers to the questions came from his memory of what happened that night and nothing different; Brandon confirmed that his answers were from his own memory. (Tr. 647).
The court then found that Brandon was competent to testify, and the defense objected. (Tr. 639, 647). The court noted that the defense could cross-examine on any prepping to diminish the value of Brandon's testimony in the eyes of the jury. (Tr. 640). In fact, when the defense cross-examined Brandon and asked him if he told the jury anything that someone told him but that he did not witness, he said, "I didn't know he rolled down the hill and cut himself." (Tr. 657).
Appellant contends that Brandon's testimony should have been excluded on the mere grounds of "coaching." No case law is cited in support of this proposition. The state responds that it is a universal practice for attorneys to spend time preparing their witnesses. We have held that the prosecutor is free to prepare witnesses and review the expected testimony. State v. Cechura (May 8, 2001), Columbiana App. No. 99CO74, citing State v. Bowen (Dec. 8, 1999), Columbiana App. No. 96CO68. The court did not abuse its discretion in finding Brandon to be a competent child and allowing him to testify. It is the jury's province to weigh the testimony of the child and determine whether some of his answers are not his own. Id. at 10-11, citing State v. DeHass (1967), 10 Ohio St.2d 230,231. See, also, State v. Rickard (Sept. 25, 1992), Mercer App. No. 10-91-5. In accordance, this assignment of error is overruled.
For the foregoing reasons, appellant's convictions are hereby affirmed.
Donofrio, J., concurs.
DeGenaro, J., concurs.